## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN RIVERS<br>1101 14th Street NW, Suite 1400<br>Washington, DC 20005<br><br>NATIONAL AUDUBON SOCIETY<br>225 Varick St.<br>New York, NY 10014<br><br>SIERRA CLUB<br>National Headquarters<br>2101 Webster St Suite 1300<br>Oakland, CA 94612<br><br>HEALTHY GULF<br>935 Gravier St., Suite 700<br>New Orleans, LA 70112<br><br>      *Plaintiffs,*<br><br>  v.<br><br>ENVIRONMENTAL PROTECTION AGENCY<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460<br><br>ANDREW WHEELER in his official capacity as<br>Administrator of the<br>Environmental Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Mail Code 1101A<br>Washington, DC 20460<br><br>      *Defendants.* | Case No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Rivers, National Audubon Society, Sierra Club, and Healthy Gulf (collectively the "Conservation Organizations") file this Complaint for Declaratory and Injunctive Relief against the Environmental Protection Agency ("EPA") and Andrew Wheeler in his official capacity as Administrator of the EPA, and allege as follows.

## I.      INTRODUCTION

1.      This case challenges EPA's last-minute decision to revoke its decisive Clean Water Act veto issued in 2008 to protect some of the richest wetland and aquatic resources in the Nation. EPA's revocation contravenes the explicit terms of the agency's own veto, violates the Clean Water Act, and disregards core principles of administrative law, including the obligation to seek public comment and provide a rational explanation for such an abrupt reversal.

2.      EPA's illegal revocation clears the way for construction and operation of the same project with the same unacceptable adverse impacts prohibited by the veto—that is, the same massive pumping plant with the same purpose, structure, and operating parameters that will drain tens of thousands of acres of hemispherically significant wetlands in an ecologically rich and sparsely populated area of Mississippi known as the Yazoo Backwater Area.

3.      The Yazoo Backwater Area contains one of the few remaining intact bottomland hardwood forested wetlands in the Lower Mississippi River Alluvial Valley, includes at least 250,000 acres of conservation lands that are managed as wetland resources, supports a highly productive floodplain fishery, and provides globally significant habitat for migratory birds and waterfowl.  Sixty percent of all bird species in the United States use the Yazoo Backwater Area, including 28 million migratory birds and 40 percent of the Nation's waterfowl population.

4.      EPA safeguarded this ecosystem in 2008 by exercising its authority under Section 404(c) of the Clean Water Act to veto the construction and operation of a 14,000 cubic feet per second (cfs) pumping plant (hereinafter the "Yazoo Pumps Project") proposed by the U.S. Army Corps

1

of Engineers ("Corps").  After a robust public process and extensive examination of a comprehensive administrative record, EPA issued a Final Determination (the "Veto") prohibiting the Yazoo Pumps Project, as well as every alternative proposed by the Corps that included the pumping plant feature, so as to prevent "unacceptable adverse effects" to more than 28,400 acres of wetlands in an area that provide vital habitat to more than 450 species of birds, fish, and wildlife.

5.      EPA has issued only 13 vetoes since the Clean Water Act was enacted in 1972, out of nearly 2 million projects approved by the Corps during that timeframe.  Congress granted this backstop authority to EPA in recognition of its role as the "environmental conscience" of the Clean Water Act.

6.      EPA has never revoked a veto.

7.      The Corps nevertheless insisted on completing the Yazoo Pumps Project, notwithstanding the Veto.  To that end, the Corps issued a Draft Supplemental Environmental Impact Statement in 2020 (hereinafter the "2020 DSEIS") that refused to consider "any new alternatives" and instead proposed the same pumping plant at a nearby location with the exact same key features as the vetoed Yazoo Pumps Project (hereinafter the "Yazoo Pumps Redo").

8.      The Yazoo Pumps Redo includes the same 14,000 cfs pumping plant prohibited by the Veto, would discharge fill material into the same wetlands prohibited by the Veto, would operate the pumping plant under the same parameters prohibited by the Veto, would drain the same project area prohibited by the Veto, and would cause unacceptable adverse impacts to wetlands and fisheries by degrading at least 38,774 acres of wetlands—a level that far exceeds the amount prohibited by the Veto.

9.      Even though the Veto squarely prohibits the Yazoo Pumps Redo, EPA nevertheless claimed that the Veto does not apply to the Yazoo Pumps Redo, thereby revoking the protections afforded by the Veto and allowing the Corps to proceed with the construction and operation of the pumping plant (hereinafter the "Veto Revocation").  EPA granted this illegal revocation in two cursory paragraphs tucked into a November 30, 2020 cover letter transmitting EPA's technical comments on the 2020 DSEIS.

10.     The Conservation Organizations challenge the Veto Revocation as arbitrary, capricious, and contrary to EPA's substantive and procedural obligations under the Clean Water Act and the Administrative Procedure Act ("APA").

11.     The Veto Revocation fails to ensure that the Yazoo Pumps Redo will not cause the same unacceptable adverse effects to wetlands and fisheries prohibited by the Veto.  On the contrary, EPA blinded itself to the extensive factual record—including its own detailed findings— demonstrating that the Yazoo Pumps Redo would degrade wetlands far in excess of the amount prohibited by the Veto.

12.     EPA instead attempted to justify the Veto Revocation based on its conclusory contention that the Yazoo Pumps Redo contains a handful of additional features that purportedly distinguish it from the prohibited pumps projects.  However, EPA ignored clear evidence, including its own analysis, showing that some of these additional features would *exacerbate* the unacceptable adverse effects to fisheries and wildlife prohibited by the Veto while the others would do nothing to avoid those impacts.

13.     EPA also abandoned any pretense of public process by foregoing any notice or opportunity for public comment prior to revoking the Veto.  The agency's attempt to circumvent procedural safeguards and fast-track the Yazoo Pumps Redo—so that the Corps can approve the

project before the end of the Trump administration—violates Section 404(c) of the Clean Water Act, contravenes EPA's longstanding practice of ensuring public participation in any request to alter a final veto, and disregards the rulemaking provisions of the APA.

14.     The Veto Revocation is a final agency action subject to review under the APA as it sets forth EPA's final position and allows the Corps to approve construction and operation of the Yazoo Pumps Redo in direct violation of the Veto.

15.     The Conservation Organizations are harmed by the Veto Revocation because it unlawfully clears the way for the Yazoo Pumps Redo, which will degrade or destroy wetlands and other aquatic and natural resources, harming the Conservation Organizations and their members' interests in the ecologically rich Yazoo Backwater Area.

16.     The Conservation Organizations seek vacatur of the Veto Revocation, along with appropriate declaratory and injunctive relief under the APA, because EPA's decision is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

## II.     JURISDICTION AND VENUE

17.     This action arises under the Clean Water Act, 33 U.S.C. § 1251 et. seq., and the APA, 5 U.S.C. §§ 702–06.  This Court has jurisdiction over the parties and subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. §§ 2201–02 (declaratory judgment).

18.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the District of Columbia, including significant involvement by EPA Headquarters in both the initial decision to veto the Yazoo Pumps Project and the challenged decision to revoke the Veto and allow the Yazoo Pumps Redo to proceed.

4

### III.     PARTIES

**A.  Plaintiffs**

19.      American Rivers is a national non-profit organization headquartered in Washington D.C. whose mission is to protect wild rivers, restore damaged rivers, and conserve clean water for people and nature.  Since 1973, American Rivers has protected and restored more than 150,000 miles of rivers through advocacy efforts, on-the-ground projects, and its annual America's Most Endangered Rivers campaign, which highlights and advocates for rivers that are confronted by imminent decisions that will determine the health of the rivers' futures.  Since 1995, American Rivers has advocated against the Corps' proposal to construct and operate the Yazoo Pumps Project because of its significant and unacceptable impacts on wetlands, fish and wildlife, water quality, and downstream flooding.  Construction and operation of the proposed 14,000 cfs pumping plant would cause large-scale, widespread degradation of the Yazoo Backwater Area, harming the interests of American Rivers and its members who routinely visit this area to canoe, birdwatch, fish, hunt, and otherwise enjoy some of the Nation's richest fisheries, wildlife habitat, and bottomland hardwood forested wetlands.

20.      The National Audubon Society ("Audubon") is a non-profit conservation organization established in 1905 that works to protect birds and the places they need throughout the Americas.  Guided by the belief that where birds thrive people prosper, Audubon engages its network of more than 1.8 million members, state programs, nature centers, and chapters from around the country.  Audubon has long regarded the Lower Mississippi River Delta and the Yazoo Backwater Area as a globally significant ecoregion that is vital to the overall ecological health of the Mississippi Flyway.  Audubon members and supporters were instrumental in securing EPA's veto of the Yazoo Pumps Project to protect these rich habitats, and safeguarding this decision is a significant priority for Audubon.  Audubon is a leading voice in advocating for

an alternative strategy to the Pumps that would provide immediate, effective, and affordable

flood relief recovery and long-term protections for birds and communities that depend on the

Mississippi Flyway.  Audubon's members frequent the Yazoo Backwater Area to enjoy its many

recreational opportunities, such as bird-watching, hiking, paddling, and photography, and to

conduct community science projects; these activities would be severely impacted by the

proposed pumping project.

21.    The Sierra Club is a national non-profit organization that was established in 1892 and has

3.8 million members.  Sierra Club's mission is to explore, enjoy, and protect the wild places of

the earth; to practice and promote responsible use of the earth's ecosystems and resources; and to

educate and encourage the public to protect natural resources.  Sierra Club has long advocated

against the Corps' attempt to construct and operate a pumping plant in the Yazoo Backwater

Area because of the unacceptable adverse impacts on fish and wildlife and water quality.

Instead, Sierra Club has supported non-structural alternatives that would provide marginalized

communities with equitable, just flood relief and long-term protections.  This advocacy has

included the submission of comments, involvement in public comment periods and appearance at

public hearings, public education, and publishing issue papers.  Sierra Club's members have a

long-standing connection to the Yazoo Backwater Area, which they have used for outdoor

recreation, such as hiking, paddling, and wildlife watching.  The Yazoo Pumps Redo would

significantly impair their members' enjoyment of this special, unique place while failing to

deliver any meaningful flood relief for underrepresented communities.

22.    Healthy Gulf is a twenty-five year old environmental nonprofit organization focused on

the health of the Gulf of Mexico, its wetlands and waters, and the communities dependent upon

them.  The organization empowers people to protect and restore the natural resources of the Gulf

of Mexico region, often assuming a watchdog role.  Formerly titled Gulf Restoration Network, the organization actively commented on the Yazoo Pumps Project, and engaged in organizing efforts to protect wetlands there.  It advocated against filling and degrading wetlands to construct and operate a puling plant, and proposed instead non-structural flood control alternatives less disruptive to wetland habitats, soils, streams and wildlife in the Yazoo Backwater Area.  Healthy Gulf's members frequently visit the Yazoo Backwater Area to enjoy its ecological richness and biodiversity through activities such as hiking, paddling, and bird-watching, all of which would be adversely impacted by the proposed pumping plant.

23.    The Conservation Organizations have long opposed the Corps' attempts to construct and operate a massive pumping plant in the Yazoo Backwater Area due to the unacceptable adverse effects on some of the Nation's most valuable wetlands, wildlife, and fishery resources.  The Conservation Organizations also oppose the long-vetoed pumps project because it could create significant flood risks for communities in north Vicksburg and the Yazoo Backwater Area—concerns raised by both the conservation community and EPA—without delivering the purported flood damage reduction benefits claimed by the Corps.

24.    The Conservation Organizations and EPA have long advocated for non-structural and natural infrastructure solutions—including such things as conservation and flood easements, wetland restoration, flood proofing or elevation of structures, purchasing flood-prone properties, and voluntary relocations—to reduce flood risks and increase community resilience in the Yazoo Backwater Area.  The Conservation Organizations provided the Corps and EPA with a detailed alternative proposal (known as the "Resilience Alternative") that includes a suite of proven, low-cost, natural infrastructure and non-structural measures that would provide immediate, effective, sustainable, and environmentally sound relief to communities in the Yazoo Backwater Area

7

while providing ecological benefits.  Yet, the Corps flatly refused to consider this alternative or any other alternative in the 2020 DSEIS, and instead insisted on completing the same 14,000 cfs pumping plant.

25.     The Conservation Organizations documented their significant concerns with the Yazoo Pumps Redo in letters sent to both the Corps and EPA on June 15, 2020 and November 30, 2020. EPA acknowledged receipt of both letters.

**B.  Defendants**

26.     EPA is a federal agency headquartered in the District of Columbia and made the illegal Veto Revocation decision that is the subject of this Complaint.

27.     Andrew Wheeler is the Administrator of the EPA and is sued in his official capacity.  As EPA Administrator, Mr. Wheeler is charged with the authority to prohibit, deny, or restrict the discharge of dredged or fill material at a disposal site whenever he determines the discharge would cause unacceptable adverse impacts on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas.

## IV.     STATUTORY FRAMEWORK

**A.      The Clean Water Act**

28.     Congress enacted the Clean Water Act in 1972 with the objective to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

29.     Congress established several goals for the Act, including attainment and preservation of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(2).

30.     To further these goals, Congress prohibited the "discharge of any pollutant" into navigable waters except in accordance with the Clean Water Act.  *Id.* § 1311(a).

8

31.    Congress granted the Corps authority to issue permits for the discharge of dredged or fill material under Section 404 of the Clean Water Act. *Id.* § 1344. Section 404(a) allows the Corps to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id*. § 1344(a).

32.    The Clean Water Act directs the Corps to evaluate sites for the discharge of dredged or fill material "[s]ubject to subsection (c) of this section" and "through the application of guidelines developed by the [EPA] Administrator." *Id*. § 1344(b). Accordingly, to grant a Section 404 permit, the Corps must satisfy both the Section 404(b)(1) Guidelines—the binding regulations promulgated by the EPA—and any restrictions on discharges established through Section 404(c) by EPA.

33.    In its permit review, the Corps must evaluate applications under the environmental criteria set forth in the Clean Water Act Section 404(b)(1) Guidelines, which are the enforceable regulations promulgated by EPA. *See* 33 C.F.R. Part 320, 40 C.F.R. Part 230. The Guidelines explicitly apply to the Corps when it seeks to approve its own water resources projects. 33 CFR § 336.1(a).

34.    The Guidelines prohibit the Corps from authorizing any discharge of dredged or fill material: (1) if a practicable alternative to the proposed discharge would have less adverse impact on the aquatic ecosystem; (2) if the discharge will cause or contribute to significant degradation of the environment; (3) if the discharge will cause or contribute to violations of water quality standards; (4) if the discharge will jeopardize a listed species or adversely modify critical habitat; and (5) unless all appropriate steps have been taken to minimize potential adverse impacts. 40 C.F.R. § 230.10.

35.   Section 404(c) of the Clean Water Act grants the EPA Administrator the authority to preclude or override the Corps' decision to issue a 404 permit or authorize its own project to dredge or fill jurisdictional waters.  33 U.S.C. § 1344(c).  Section 404(c) is commonly referred to as EPA's "veto authority."  Congress granted this backstop authority to EPA in recognition of its role as the "environmental conscience" of the Clean Water Act.

36.   Section 404(c) authorizes the EPA Administrator to "prohibit the specification . . . of any defined area as a disposal site" whenever he or she determines "that the discharge of such materials "will have an unacceptable adverse effect on . . . fishery areas (including spawning and breeding areas), wildlife," and other resources.  *Id.*  In making this determination, the Administrator must provide "notice and opportunity for public hearings" in order to determine whether a proposed project will cause unacceptable adverse effects.  *Id.*

37.   EPA's regulations define an "unacceptable adverse effect" as an "impact on an aquatic or wetland ecosystem which is likely to result in … significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas." 40 C.F.R. § 231.2(e).

38.   Section 404(c) authorizes EPA to prohibit, deny, or restrict the discharge of dredged or fill material at a disposal site.  To "prohibit specification" of a disposal site means "to prevent the designation of an area as a present or future disposal site."  *Id.* § 231.2(b).

39.   EPA's regulations set forth a rigorous process to ensure that the Administrator exercises the authority to veto a project consistent with the unacceptable adverse effects standard and after an opportunity for public comment.  *Id.* § 231.3(a).

40.   At the first step of the process, the Regional Administrator initiates the Section 404(c) process if he or she "has reason to believe … that an 'unacceptable adverse effect' could result from the specification or use for specification of a defined area for the disposal of dredged or fill

material." *Id.* § 231.3(a).  To do so, the Regional Administrator notifies the Corps and the project proponent of his or her intention to issue a public notice of a proposed determination to withdraw, prohibit, deny, or restrict the specification of a defined area for discharge of dredged or fill material, and provides them with 15 days to take corrective action to prevent an unacceptable adverse effect(s).  *Id.* § 231.3(a).  If the Regional Administrator does not receive information demonstrating that the Corps and the project proponent will take corrective action to ensure that the project will not cause unacceptable adverse effect(s) within 15 days, the Regional Administrator moves forward and publishes a public notice of the proposed determination.  *See id.* § 231.3(a)(2).

41.     Following public notice of the proposed determination, EPA must provide for a comment period of at least 30 days regarding its determination of unacceptable adverse effect(s).  *Id.* § 231.4(a).  EPA must also provide a public hearing, if the Regional Administrator finds a significant degree of public interest in a proposed determination or if it would otherwise be in the public interest to hold a hearing.  *Id.* § 231.4(b).

42.     The Regional Administrator then prepares a recommended determination to withdraw, prohibit, deny, or restrict the specification of a defined area for disposing of dredged or fill material due to the unacceptable adverse effect(s) and forwards it along with the administrative record to the Assistant Administrator for the Office of Water.

43.     The Assistant Administrator for the Office of Water must then make a final determination affirming, modifying, or rescinding the recommended determination.  *Id.* § 231.6.  The final determination must identify any corrective action taken to prevent an unacceptable adverse effect, make findings, and provide a rational basis for the final determination.  *Id.*  Through this process, the Assistant Administrator must "take into account all information available to him,

including any written determination of compliance with the section 404(b)(1) Guidelines." *Id.* § 231.1(a).

44.     EPA must publish notice of the final determination, through the procedures set forth in 40 C.F.R. § 231.3, including to all persons who participated in the public hearing. *Id.* § 231.6.

45.     EPA's regulations centralize the decision-making process with EPA Headquarters in Washington D.C. "to ensure consistency and to set some precedents for future guidance." Denial or Restriction of Disposal Sites Section 404(c) Procedures, 44 Fed. Reg. 58,078, 58,081 (Oct. 9, 1979).

46.     In 1984, the Administrator delegated the authority to make final decisions under Section 404(c) to EPA's national Clean Water Act Section 404 program manager, who is the Assistant Administrator for the Office of Water.  In a subsequent Delegation of Authority Memorandum dated March 30, 2018, then-EPA Administrator Scott Pruitt likewise delegated 404(c) authority "to restrict or prohibit designation of disposal sites" to the Assistant Administrator for the Office of Water.

47.     EPA has used its veto authority sparingly, vetoing just 13 projects, since the enactment of the Clean Water Act in 1972.  Over that timeframe, the Corps has approved approximately 2 million activities under Section 404.

48.     EPA has never revoked a veto.

49.     EPA has modified only three vetoes.  Each modification followed the same key elements of the Section 404(c) process.  First, the applicant petitioned EPA to allow the discharge of fill material into a location prohibited by a veto.  In the case where the Army Corps sought permission to discharge fill material into a prohibited location, it sent a letter to EPA requesting permission to modify the veto to allow the discharge.  Second, the relevant EPA Regional

Administrator considered the petition or request along with any supporting information the applicant submitted demonstrating that the discharge will not cause an unacceptable adverse impact. Third, the Regional Administrator provided public notice and sought public comment regarding that proposed modification. Fourth, the Regional Administrator issued a proposed determination regarding the adverse impacts of the requested discharge, including a finding of whether the modification would avoid unacceptable adverse effects. The Regional Administrator then forwarded its proposed determination to the Assistant Administrator for the Office of Water. Fifth, after "carefully review[ing]" the proposal, comments from federal agencies and the public, and "the existing… section 404(c) record," the Assistant Administrator issued a final determination regarding whether or not the proposed discharge would have unacceptable adverse effects and would accordingly be prohibited or allowed. *See, e.g.*, M.A. Norden Company Site, AL; Modification of June 15, 1984, Clean Water Act Section 404(c) Final Determination, 59 Fed. Reg. 46,246 (Sept. 7, 1994).

**B. The Administrative Procedure Act**

50.     The APA requires the court to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

51.     An agency's decision is arbitrary and capricious if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

52.     Under the APA, an agency "must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.*

53.     An agency's change in position is arbitrary and capricious under the APA unless the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

54.     Section 4 of the APA, 5 U.S.C. § 553, requires agencies to issue a "[g]eneral notice of proposed rule making," ordinarily by publication in the Federal Register. *Id.* § 553(b).  If "notice [is] required," the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

### V.     FACTUAL BACKGROUND

**A.  The Yazoo Backwater Area Sustains Some of the Nations' Richest Wetland and Aquatic Resources.**

55.     The Lower Mississippi River Alluvial Valley once supported 25 million acres of forested wetlands that extended along both sides of the Mississippi River from Illinois south to Louisiana and the Gulf of Mexico, as depicted in the figure below.



**Figure 1: Location of the Yazoo Basin in northwestern Mississippi (Klimas et al. 2011:2)**

56.    Over the past 100 years, however, land clearing for agriculture and flood control projects has eliminated approximately 80% of the bottomland forested wetlands in the Lower Mississippi River Alluvial Valley.  These landscape scale changes have fundamentally altered wildlife habitat and reduced biological diversity and integrity of this ecosystem.

57.    The Yazoo Basin in northwestern Mississippi contains one of the last existing and most substantial tracts of highly productive bottomland hardwood forested wetlands in the Lower Mississippi River Alluvial Valley.  The portion of this area relevant to the Yazoo Pumps Project—the Yazoo Backwater Area—is bounded on the west by the left descending bank of the mainline Mississippi River levee, on the east by the west bank levees of the Will M. Whittington Auxiliary channel and the connecting channel, and the Yazoo River on the south, and comprises about 926,000 acres, as depicted below.



58.     The Yazoo Backwater Area contains some of the richest wetland and aquatic resources in the Nation, including a highly-productive bottomland hardwood forest and a floodplain fishery that supports at least 95 different species of fish.

59.     The Yazoo Backwater Area is also a globally significant migratory bird foraging ground located in the heart of the Mississippi Flyway—a major continental migration corridor that funnels birds through the midcontinent from as far north as the Arctic Circle and as far south as South America, as depicted below.

16



60.     The Yazoo Backwater Area supports 257 bird species, including 60 percent of all North American bird species, 40 percent of the Nation's waterfowl population, and several species recognized as federally and/or state threatened or endangered.  More than 10 million birds use the Yazoo Backwater Area during spring migration, and that number swells to more than 18 million during the fall migration.

61.     In total, the Yazoo Backwater Area provides vital habitat supporting more than 450 species of birds, fish, and wildlife.

62.     The stunning biodiversity of the Yazoo Backwater Area is largely a product of the area's complex floodplain hydrology.  The hydrologic cycle of water moving into and out of the area fuels the fundamental biological processes essential to wetlands, fish, and wildlife productivity.

63.     EPA has identified hydrology—which includes water depth, flow patterns, and the duration and frequency of flooding—as the single most important determinant of wetland types

and functions.  Even small alterations in wetland hydrology can produce significant, ecosystem-wide changes in species composition and richness and in ecosystem productivity.

64.     Federal and State agencies have spent many millions of dollars to conserve the vital floodplain ecosystem in the Yazoo Backwater Area.  As a result, the area contains at least 250,000 acres of conservation lands, including nationally significant public lands.

**B.  The Corps Proposes the Yazoo Pumps Project.**

65.     The Corps has constructed multiple large-scale flood control projects in the Yazoo Backwater Area, including a system of levees, channels, and flood gates that have greatly reduced flood damages in the Yazoo Backwater Area caused by flood events on the Mississippi and Yazoo Rivers.  When high water stages occur on the Mississippi and Yazoo Rivers, the Corps can close the Steele Bayou flood control gate to prevent flows from backing up into the Yazoo Backwater Area.

66.     In 2007, the Corps released a final supplemental environmental impact statement ("2007 FSEIS") that proposed construction of a 14,000 cfs pumping plant in the Yazoo Backwater Area to drain water, primarily from low-lying agricultural lands, during certain types of flood events to facilitate increased agricultural production on those lands (known as the Yazoo Pumps Project).

67.     The fundamental objective of the project was to limit the spatial extent, frequency, and length of time the Yazoo Backwater Area floods.

68.     The 2007 FSEIS evaluated five alternatives that included a 14,000 cfs pumping plant—the primary "structural" component of the project.  This pumping plant would be located near the Steele Bayou flood control gates and would pump surface water out of the Yazoo Backwater Area when the flood gates are closed to prevent high water events on the Mississippi River from flooding the Yazoo Backwater Area.

18

69.     The five alternatives varied with respect to pump-on-elevation, non-structural features

(such as conservation measures), and operating plans for the Steele Bayou flood control gates to

alter water levels during low-water periods (i.e. when the pumps are not operating).

- Plan 3 included a 14,000 cfs pumping plant with a pump-on elevation of 80 feet[1] from

  March 1st to October 31st, and 85 feet from November 1st to February 28th.  It also

  included a non-structural measure that would modify operation of the Steele Bayou flood

  control gates to maintain water at 70 to 73 feet during low-water periods (as compared to

  the existing criteria, which holds the water level at 68.5 to 70 feet).

- Plan 4 included a 14,000 cfs pumping plant with a year-round pump-on elevation of 85

  feet.  The non-structural measures included reforestation/conservation easements on

  37,200 acres of agricultural lands from willing sellers only, and modified operation of the

  Steele Bayou flood control gates to maintain water at 70 to 73 feet during low-water

  periods.

- Plan 5 (the Yazoo Pumps Project and the Corps' recommended plan) included a 14,000

  cfs pumping plant with a year-round pump-on elevation of 87 feet.  The non-structural

  measures included conservation easements/reforestation on up to 55,600 acres of

  agricultural lands from willing sellers only, and modified operation of the Steele Bayou

  flood control gates to maintain water at 70 to 73 feet during low-water periods.

- Plan 6 included a 14,000 cfs pumping plant with a year-round pump-on elevation of 88.5

  feet.  The non-structural component included reforestation/conservation easements on

  81,400 acres of agricultural lands from willing sellers only, as well as modified operation

---

[1] All elevations are based on National Geodetic Vertical Datum.

of the Steele Bayou flood control gates to maintain water at 70 to 73 feet during low-water periods and reintroduce water up to 87 feet.

- Plan 7 involved a 14,000 cfs pumping plant with a year-round pump-on elevation of 91 feet.  The non-structural feature included reforestation/conservation easements on 124,400 acres of agricultural lands from willing sellers only, and modified operation of the Steele Bayou flood control gates to maintain water at 70 to 73 feet during low-water periods and reintroduce water up to 87 feet.

70.     Construction of the 14,000 cfs pumping plant would require the discharge of dredged or fill material into approximately 43.6 acres of forested wetlands and other waters of the United States near the Steele Bayou flood control gates.  The discharge would occur at the pumping plant site, the existing inlet and outlet channels, various roadways and levees, and the borrow area where the Corps proposed to obtain additional fill material.  The borrow area at the Steele Bayou flood control gates covers approximately 23 acres of wetlands alongside the coffer dam.

71.     Operating the pumping plant would cause large-scale hydrological alterations to the aquatic ecosystem in the Yazoo Backwater Area, including alterations to the water depth, flow patterns, and the duration and frequency of flooding.  The 2007 FSEIS, however, only analyzed the impacts of the pumping plant on a small subset of wetlands in the Yazoo Backwater Area. Even that unduly constrained analysis showed that the recommended pumping plant and various alternatives evaluated would degrade the ecological functions provided by at least 28,400 to more than 67,000 acres of wetlands in the Yazoo Backwater Area.

**C.  EPA Initiated the Formal, Public Process to Veto the Yazoo Pumps Project.**

72.     On February 1, 2008, EPA Region IV informed the Corps and local project sponsor of EPA's intent to initiate a Clean Water Act Section 404(c) review of the Yazoo Pumps Project due to the unacceptable adverse effects on wildlife and fisheries.

20

73.     EPA Region IV met with the Corps, local project sponsor, and U.S. Fish and Wildlife

Service during the initial consultation period to discuss alternative formulations of the pumping

project, but was not satisfied the Corps had taken adequate corrective action to prevent an

unacceptable adverse effect.

74.     Accordingly, on March 19, 2008, EPA Region IV issued a Proposed Determination to

prohibit or restrict the discharge of fill material associated with the Yazoo Pumps Project due to

the unacceptable adverse effects on wildlife and fisheries.

75.     EPA provided public notice and comment on its Proposed Determination to veto the

Yazoo Pumps Project.

76.     The public overwhelmingly supported the Proposed Determination, including favorable

comments from: the Department of the Interior; the U.S. Fish and Wildlife Service; more than

120 conservation organizations; 540 independent scientists; the Society of Wetland Scientists;

the Association of State Wetland Managers; a former EPA Administrator; four former EPA

Assistant Administrators for Water; a former Deputy Assistant Secretary of the Army for Civil

Works; and 99.9% of the 47,600 comments submitted during the veto process, including 90% of

comments submitted by Mississippi residents.

77.     On July 2, 2008, EPA Region IV forwarded its Recommended Determination and

administrative record to EPA Headquarters in Washington D.C. for final agency action by EPA's

Assistant Administrator for the Office of Water.

78.     On August 31, 2008, EPA's Assistant Administrator for the Office of Water signed the

Final Determination.

79.     EPA Headquarters was closely involved in the Section 404(c) veto process due to

Headquarters' role as decision maker on any final action to prohibit or restrict the Yazoo Pumps

Project.  Headquarters staff attended public hearings, visited the project area, met with a Congressional delegation, and carried out a final consultation process with the Corps and local project sponsors.  Both the EPA Administrator and Assistant Administrator for the Office of Water were involved in the process.

**D.  EPA Vetoes the Yazoo Pumps Project Due to the Unacceptable Adverse Impacts to Wildlife and Fisheries.**

80.     The Veto compiles extensive information showing that the Yazoo Backwater Area contains some of the richest wetland and aquatic resources in the Nation.  These include a highly productive floodplain fishery, substantial tracts of the last-remaining bottomland hardwood forests that once dominated the Lower Mississippi River Alluvial Valley, and globally significant habitat for birds and waterfowl.

81.     Based on the analysis in the 2007 FSEIS, the Veto concludes that the construction and operation of the Yazoo Pumps Project, including each alternative proposed by the Corps that included the 14,000 cfs pumping plant, would dramatically alter the hydrologic regime of the Yazoo Backwater Area, thereby significantly degrading the critical ecological functions provided by at least 28,400 to more than 67,000 acres of wetlands.  The Veto conclusively demonstrates that this range of impacts to wetlands and the fish and wildlife resources that rely on those wetlands is both significant and unacceptable.

82.     In addition, the Veto demonstrates that the 2007 FSEIS severely underestimated the impacts to wetlands, wildlife, and aquatic habitat in the Yazoo Backwater Area by only considering the proposed pumps' impacts on a small subset of wetlands located within the 2-year floodplain that receive 14 or more consecutive days of flooding (among other flaws).   As a result, the 2007 FSEIS overlooked "highly significant impacts" to wetlands, wildlife, and fisheries caused by operation of the pumping plant.  For example, the Veto demonstrates that the

2007 FSEIS excluded consideration of impacts to approximately 52,000 acres of jurisdictional wetlands in the 2-year floodplain that receive less than 14 consecutive days of flooding.  Based on its own analysis in the Veto, EPA concluded that proposed pumps would "result in the complete loss and/or change in key functions on 24,000 acres of these wetlands," which amplified EPA's concerns about the project's unacceptable adverse effects.

83.     The Veto and its technical appendices document these and other findings in 287 pages of single-space analysis that include the results of EPA's own field surveys, hydrological modeling, review of the scientific literature, and detailed responses to public comments.

84.     To prevent the unacceptable adverse impacts caused by the operation of a 14,000 cfs pumping plant structural feature, EPA took final agency action "to prohibit[], pursuant to section 404(c) of the CWA, the specification of the subject wetlands and other waters of the United States as described in the FSEIS as a disposal site for the discharge of dredged or fill material for the purpose of construction of FSEIS Plans 3 through 7, and Modified Plan 6."

85.     The Veto states that the "adverse effects associated with the prohibited projects are the result of a combination of operational factors including the capacity of the pumping station and its associated pump-on elevations."  Accordingly, the Veto's findings of unacceptable adverse effects apply to any "derivatives of the prohibited projects that involve only small modifications to the operational features or location of these proposals [which] would also likely result in unacceptable adverse effects and would generate a similar level of concern and review by EPA."

86.     Consistent with these statements, EPA vetoed a modified alternative (Modified Alternative 6) proposed by the Corps because it contained the same 14,000 cfs pumping plant with a pump-on elevation of 88.5 feet.  Although EPA did not have precise estimates of the alternative's operational impacts on wetlands, it noted they "would likely fall between 28,408

and 48,066 acres," thereby causing unacceptable adverse impacts in violation of the Clean Water Act.

87.     EPA explained that it only prohibited the alternatives that included the pumping plant structural feature as part of a "sincere effort" to work with the Corps, local project sponsor, and interested parties to develop alternative, *non-structural* forms of flood protection for the Yazoo Backwater Area.  The Veto sought to advance those efforts by foreclosing the prohibited pumps projects (the "structural" feature) while allowing the Corps to consider non-structural alternatives, including those identified in the 2007 FSEIS that the Corps eliminated from consideration.

88.     To this end, the Veto prohibits the specification of present or future disposal sites at the Steele Bayou location, which the 2007 FSEIS identified as the feasible location for the proposed pumping plant.  The Veto forecloses construction and operation of the proposed pumping plant without the need to withdraw the entire Yazoo Backwater Area as a present or future disposal site, as EPA Region IV originally suggested.

**E.  EPA Urges the Corps to Consider Non-Structural Alternatives to the Vetoed Pumps Projects.**

89.     Both prior to and since issuing the Veto in 2008, EPA has repeatedly urged the Corps to consider non-structural alternatives to the Yazoo Pumps Project, such as the approach outlined in the Resilience Alternative proposed by the Conservation Organizations.

90.     EPA has also warned the Corps that it would not consider modifying or altering the Veto without complying with the key elements of the Section 404(c) process.  As recently as August 2019, EPA refused to reevaluate the Veto because the Corps provided the EPA with a purportedly updated wetlands analysis that nonetheless failed to fix the errors in the 2007 FSEIS, which severely underestimated the impacts to wetlands.  Because the Corps simply recycled

those same flaws, EPA concluded that the Corps' flawed analysis "was not sufficiently comprehensive to provide the type of record that would be required to evaluate a potential modification or withdrawal of the Final Determination." EPA also reiterated its long-standing position of providing an opportunity for public notice and comment prior to its consideration of any request to alter a final veto.

**F. The Corps Refuses to Consider Any Alternatives and Instead Attempts to Resurrect the Long-Vetoed Yazoo Pumps Project.**

91.     Instead of heeding the Veto and EPA's warnings, the Corps issued a notice of its intent to "complete the Yazoo Area Pump Project feature." The Corps set forth an accelerated schedule to complete its review and issue a decision before the end of the Trump administration.

92.     The Corps released a Draft Supplemental Environmental Impact Statement on October 4, 2020 (the "2020 DSEIS"). The 2020 DSEIS refuses to consider "any new alternatives" and instead focuses solely on a proposed project—the Yazoo Pumps Redo—that includes the same 14,000 cfs pumping plant with the same purpose, operating parameters, and unacceptable adverse impacts to wetlands, wildlife, and fisheries as the vetoed pumps projects.

93.     The Yazoo Pumps Redo shares the same fundamental objective of the vetoed pumps projects, which is "the reduction in interior flooding during backwater flood events. When activated, the pumps will lower the water surface of floods greater than the 1-year frequency flood, which will reduce the extent and duration of the flood." In fact, the 2020 DSEIS refuses to consider any new goals or objectives for the Yazoo Pumps Redo.

94.     The primary "structural" feature of the Yazoo Pumps Redo would be a 14,000 cfs pumping plant with a pump-on elevation of 87 feet. This is the same structural feature with the same exact operational parameters as the long-vetoed Yazoo Pumps Project.

95.     Construction of the Yazoo Pumps Redo would require the discharge of dredge and fill material into the same wetlands prohibited from specification by the Veto.  As stated in the 2020 DSEIS:  "The borrow area identified for the previous design will be used for the new design."  This borrow area is "north of and adjacent to the Steele Bayou structure" and "was identified to provide fill material for the previous design."  This borrow area contains 23 acres of wetlands that would be directly impacted by construction of the Yazoo Pumps Redo, and all of which were prohibited from specification by the Veto.

96.     The 2020 DSEIS also relies on the same environmental documents to analyze the Yazoo Pumps Redo (i.e., "tiers to" the 2007 FSEIS).  The 2020 DSEIS amplifies this problem by replicating the same flaws expressly rejected by the Veto.  For example, the 2020 DSEIS only considers impacts to a small subset of wetlands located within the 2-year floodplain that receive 14 or more consecutive days of flooding.  By recycling this unduly constrained analysis, the 2020 DSEIS once again omits "highly significant impacts" to wetlands, wildlife, and fisheries.  EPA rejected this approach in the Veto as it severely underestimates wetland impacts.  EPA again rejected this approach in its technical comments on the 2020 DSEIS because it excludes approximately 96,139 acres of known wetlands, thereby violating the binding Section 404(b)(1) Guidelines.

97.     Even though the 2020 DSEIS severely underestimates wetland impacts, it acknowledges that operation of the Yazoo Pumps Redo would degrade more than 38,774 acres of wetlands, which far exceeds the level prohibited by the Veto due to the unacceptable adverse impacts on wildlife and fisheries.

98.     In addition, modeling data in the Corps' files (but not included in the 2020 DSEIS) shows that the Yazoo Pumps Redo would reduce, if not eliminate, backwater flooding on at least 22,601

26

acres of additional wetlands that flood for less than 14 consecutive days.  These additional impacts amplify the unacceptable adverse impacts to wetlands, wildlife, and fisheries, just as was the case for the pumps projects prohibited by the Veto.

**G.  EPA Abruptly Revokes the Veto and Allows the Yazoo Pumps Redo.**

99.     On November 30, 2020, EPA Region IV's Administrator sent the Corps a cover letter transmitting EPA's technical comments on the 2020 DSEIS.  The cover letter includes a conclusory, two-paragraph statement revoking the Veto and allowing the Corps to proceed with the Yazoo Pumps Redo.

### i.   EPA Disregards the Fact that the Yazoo Pumps Redo Would Cause Unacceptable Adverse Impacts to Wildlife and Fisheries.

100.    The Veto Revocation does not acknowledge or consider the fact that the Yazoo Pumps Redo includes the same 14,000 cfs pumping plant whose purpose, structure, and operation would degrade at least 38,774 acres of wetlands, causing unacceptable adverse impacts to wildlife and fisheries far in excess of the amount already deemed unacceptable by EPA and prohibited by the Veto.

101.    In addition, the Veto Revocation entirely disregards the fact that the Yazoo Pumps Redo would adversely affect an additional 22,601 acres of wetlands—beyond the severe underestimation of 38,774 acres identified in the 2020 DSEIS—thereby amplifying the unacceptable adverse impacts of the project.

102.    The Veto Revocation does not even acknowledge or consider the fact that construction of the Yazoo Pumps Redo would involve the discharge of dredge and fill material into the same wetlands prohibited from specification as a disposal site by the Veto.

### ii.  EPA Failed to Provide a Rational Basis for the Veto Revocation and Ignored Contrary Evidence.

103.    The Veto Revocation lists five purportedly new features of the Yazoo Pumps Redo

without any explanation of how they avoid the unacceptable adverse effects to wildlife and

fisheries identified by the Veto.  To the contrary, some of these features would exacerbate the

unacceptable adverse effects to wetlands, wildlife, and fisheries as shown by EPA's own

analysis, while the others will do nothing to offset impacts.  Yet, EPA ignored these facts, as

well as its own technical comments on the 2020 DSEIS that undercut its purported reasons for

revoking the Veto and clearing the way for the Yazoo Pumps Redo.

104.    First, the Veto Revocation notes that the same 14,000 cfs pumping plant would be moved

to a nearby location at Deer Creek, which is approximately eight miles east of the Steele Bayou

site and squarely within the Yazoo Backwater Area.  EPA did not provide any analysis or

explanation of how this move prevents the unacceptable adverse effects of operating the same

pumping plant in the Yazoo Backwater Area.  EPA also overlooked the fact that construction of

the pumping plant would still involve the discharge of dredge and fill at the same 23-acre borrow

area that was prohibited from specification by the Veto as a present or future disposal site.

Constructing the pumping plant at the Deer Creek site would directly impact an additional 84

acres of wetlands beyond the amount already vetoed by EPA.

105.    Second, the Veto Revocation notes that the Yazoo Pumps Redo would maintain water

levels between 68.5 and 70 feet behind the Steele Bayou flood control gates when the pumps are

not operating.  EPA did not explain how this feature—maintaining the current criteria for the

flood control gates—would avoid the unacceptable adverse impacts of constructing and

operating a 14,000 cfs pumping plant.  On the contrary, EPA's own comments on the 2020

DSEIS state that this purported feature "was not supported by data to quantify beneficial or

28

adverse effects."  In fact, by maintaining lower ponding levels at the Steele Bayou flood control gates (i.e., the status quo), the Yazoo Pumps Redo would actually eliminate the higher ponding levels that the 2007 FSEIS touted as being a major benefit of the Yazoo Pumps Project, which EPA nonetheless vetoed due to the unacceptable adverse effects.

106.    Third, the Veto Revocation states that the pumping plant would rely on natural gas as opposed to diesel.  EPA provides no explanation of how this purported change in the power source avoids the large-scale hydrological impacts of operating the same 14,000 cfs pumping plant on the Yazoo Backwater Area.  In fact, the Corps proposed a similar change to the Yazoo Pumps Project in 2007 when it switched the pumping plant from electric to diesel power.  The 2007 FSEIS did not, however, identify any associated changes in the hydrological impacts of operating the Yazoo Pumps Project, which would still cause unacceptable adverse effects on wetlands, wildlife, and fisheries prohibited by the Veto regardless of the power source.

107.    Fourth, the Veto Revocation notes that the Yazoo Pumps Redo includes a conceptual mitigation plan to install 34 groundwater wells in the watershed.  EPA, however, stated in its technical comments on the 2020 DSEIS that "the compensatory mitigation plan described in the 2020 DSEIS includes a number of deficiencies that would preclude a private party from receiving a Section 404 permit."  EPA also stated that the 2020 DSEIS contains "no mechanisms" to ensure the success of the proposed groundwater wells and "no data" to support the alleged benefits.  The Veto Revocation made no mention of these contrary findings and entirely disregarded the fact that the Yazoo Pumps Redo eliminates 8,257 acres of wetland mitigation and 52,900 acres of reforestation as compared to the Yazoo Pumps Project, which EPA still vetoed due to the unacceptable adverse effects.

108.    Fifth, the Veto Revocation states that the Yazoo Pumps Redo includes an adaptive management plan.  By definition though, that plan does not avoid the unacceptable adverse impacts of the project.  Furthermore, EPA stated in its comments on the 2020 DSEIS that the adaptive management plan lacks basic elements, such as "the collection of scientific data" and "the use of that information to inform ongoing management of the project."

109.    EPA has not demonstrated that the Yazoo Pumps Redo would avoid the unacceptable adverse effects to wetlands, wildlife, and fisheries prohibited by the Veto.  The Yazoo Pumps Redo includes the same 14,000 cfs pumping plant structural feature with the same operating parameters whose construction would require the discharge fill material into the same wetlands prohibited by the Veto and whose operation would cause unacceptable adverse effects in violation of the Veto.

### iii.   EPA Region IV Failed to Provide Any Public Notice or Comment and Acted in Excess of Statutory Authority.

110.    EPA did not provide any public notice or comment prior to its decision to revoke the Veto and allow the Corps to proceed with the Yazoo Pumps Redo.

111.    Furthermore, the Veto Revocation, which cleared the way for the Corps to fast track its approval of the Yazoo Pumps, was signed by the EPA Region IV Administrator.  The Region IV Administrator, however, lacks the authority to alter the Veto as that authority has only been delegated to the Assistant Administrator for the Office of Water.

112.    By circumventing these procedural safeguards, EPA allowed the Corps to move forward with issuing the 2020 FSEIS and finalizing its hasty approval of the Yazoo Pumps Redo.

113.    On January 11, 2021, Administrator Wheeler participated in a press conference to announce the Corps' forthcoming decision to approve the Yazoo Pumps Redo, which could

occur as soon as January 14, 2021.  He publicly stated that EPA "is allowing the Corps to finish the job that they originally designed 30, 40 years ago"—namely, the long-vetoed pumps project.

## FIRST CLAIM FOR RELIEF

### EPA's Decision Violates the Clean Water Act
### Because the Veto Prohibits the Yazoo Pumps Redo
### (33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)

114.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

115.    The Clean Water Act authorizes the Administrator to "prohibit the specification… of any defined area as a disposal site" whenever he determines the discharge will "have an unacceptable adverse effect on" various resources, including "fishery areas" and "wildlife."  33 U.S.C. § 1344(c); *see also* 40 C.F.R. § 231.1(a).

116.    To prohibit the specification of a disposal site means "to prevent the designation of an area as a present or future disposal site."  40 C.F.R. § 231.2.

117.    The Veto determined that the discharge of dredged or fill material in connection with the construction and subsequent operation of a 14,000 cfs pumping plant in the Yazoo Backwater Area, including all the alternative plans proposed by the Corps that included the pumping plant, would cause unacceptable adverse effects to more than 28,400 acres of wetlands and the fish and wildlife that depend on those wetlands.

118.    EPA took final agency action in the Veto to prohibit, pursuant to Section 404(c) of the Clean Water Act, the specification of the subject wetlands and other waters of the United States as described in the 2007 FSEIS as a disposal site for the discharge of dredged or fill material for the purpose of construction of the Yazoo Pumps Project and all the alternatives proposed by the Corps that included the same 14,000 cfs pumping plant.

119.    The Veto is a final agency action binding on the EPA and prohibits the Corps from allowing discharges inconsistent with the Veto.  33 U.S.C. § 1344; 40 C.F.R. § 231.6.

120.     The Corps nevertheless insisted on completing the Yazoo Pumps Project, notwithstanding the Veto.  In the 2020 DSEIS, the Corps refused to consider any alternatives to the long-vetoed Yazoo Pumps Project and instead proposed the Yazoo Pumps Redo.

121.     The Yazoo Pumps Redo contains the same 14,000 cfs pumping plant feature that would follow the same operating parameters to drain the same project area and achieve the same purpose as the long-vetoed pumps projects.

122.     Operation of the Yazoo Pumps Redo would degrade at least 38,774 acres of wetlands, which far exceeds the amount prohibited by the Veto due to the unacceptable adverse effects on fish and wildlife resources.

123.     Construction of the Yazoo Pumps Redo would involve the discharge of fill material into the same wetlands prohibited from specification by the Veto as a present or future disposal site.

124.     The Veto squarely prohibits the Yazoo Pumps Redo because it includes the same 14,000 cfs pumping plant whose construction would require the discharge of fill material into the same wetlands prohibited by the Veto, and whose operation would cause unacceptable adverse effects far in excess of the amount prohibited by the Veto.

125.     EPA's decision to allow the Corps to proceed with the Yazoo Pumps Redo violates the APA because it is arbitrary, capricious, and contrary to Section 404(c) of the Clean Water Act.  5 U.S.C. § 706.

### SECOND CLAIM FOR RELIEF

**The Veto Revocation is Arbitrary and Capricious Because
EPA Entirely Overlooked Critical Aspects of the Problem
(33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)**

126.     The Conservation Organizations incorporate by reference all of the preceding paragraphs.

127.     The Clean Water Act authorizes the Administrator to "prohibit the specification… of any defined area as a disposal site" whenever he determines the discharge will "have an unacceptable

adverse effect on" various resources, including "fishery areas" and "wildlife." 33 U.S.C.

§ 1344(c); *see also* 40 C.F.R. § 231.1(a).

128.    Whether a discharge will have an unacceptable adverse effects is the sole factor identified

in Section 404(c). 33 U.S.C. § 1344(c). In assessing whether a discharge will have an

unacceptable adverse effect, the EPA Administrator must "take into account all information

available to him, including any written determination of compliance with the Section 404(b)(1)

Guidelines." 40 C.F.R. § 231.1(a).

129.    EPA revoked the Veto and thereby allowed the Corps to proceed with the Yazoo Pumps

Redo without ensuring that operation of the same 14,000 cfs pumping plant would avoid

unacceptable adverse impacts to wildlife and fisheries. As a result, EPA entirely failed to

consider an important aspect of the problem and disregarded its own detailed findings, as well as

the undisputed evidence in the record, showing that the Yazoo Pumps Redo would degrade

thousands of acres of wetlands far in excess of the amount that the Veto determined would cause

unacceptable adverse effects to wildlife and fisheries in violation of the Clean Water Act.

130.    EPA also turned a blind eye on the Corps' fatally flawed analysis in the 2020 DSEIS,

which repeats the same errors that EPA definitively rejected in the Veto and every technical

comment since. As a result, EPA issued the Veto Revocation with no evidence or analysis

showing that the operation of the Yazoo Pumps Redo would avoid the unacceptable adverse

impacts to wetlands, wildlife, and fisheries prohibited by the Veto.

131.    Even the Corps' severe underestimation of wetland impacts in the 2020 DSEIS

demonstrates that the Yazoo Pumps Redo would adversely impact at least 38,774 acres of

wetlands, far in excess of the amount deemed unacceptable by the Veto. Yet, EPA blinded itself

to these unacceptable adverse impacts, as well as the evidence showing that the Yazoo Pumps

Redo would adversely impact an additional 22,601 acres of wetlands, which amplify the unacceptable adverse impacts of the pumps project.

132.    EPA also disregarded its own conclusion that the Yazoo Pumps Redo violates the Section 404(b)(1) Guidelines because the 2020 DSEIS excluded approximately 96,139 acres of wetlands from its wetlands analysis and proposed a legally inadequate conceptual mitigation plan.  EPA made no effort to correct these violations or ensure that it had sufficient information to demonstrate that the Yazoo Pumps Redo would not cause unacceptable adverse impacts in violation of the Veto.

133.    By failing to demonstrate that the Yazoo Pumps Redo will avoid unacceptable adverse effects on fisheries and wildlife in the Yazoo Backwater Area, EPA abdicated its obligations under the Clean Water Act and failed to consider critical aspects of the problem.  As a result, the Veto Revocation violates the APA because it is arbitrary, capricious, and not in accordance with the Clean Water Act.  5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF

**The Veto Revocation is Contrary to the Record Evidence and EPA
Failed to Provide a Rational Basis for Its Reversal
(33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)**

134.    The Conservation Organizations incorporate by reference all of the preceding paragraphs.

135.    EPA attempts to justify the Veto Revocation on the grounds that the Yazoo Pumps Redo contains a few purportedly new features, none of which changes the fact that the Yazoo Pumps Redo proposes the same 14,000 cfs pumping plant prohibited by the Veto, proposes discharging fill material into the same wetlands prohibited by the Veto, proposes operating the pumping plant under the same parameters prohibited by the Veto, and proposes draining the same project area prohibited by the Veto and causing unacceptable adverse effects to at least 38,774 acres of wetlands, a level of impacts explicitly prohibited by the Veto.

136.     EPA did not provide any analysis or explanation demonstrating that the Yazoo Pumps

Redo will avoid the unacceptable adverse effects to wetlands, wildlife and fisheries prohibited by

the Veto.  To the contrary, the facts in the record—including EPA's own technical comments on

the 2020 DSEIS—demonstrate that the purportedly additional features are either irrelevant or

would *exacerbate* the unacceptable adverse effects to wildlife and fisheries prohibited by the

Veto.  EPA's basis for revoking the veto is thus so implausible that it cannot be ascribed to a

difference in view or the product of agency expertise.

137.     Due to these errors, the Veto Revocation is arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law, and therefore violates the APA.  5 U.S.C. § 706.

### FOURTH CLAIM FOR RELIEF

**EPA Failed to Provide Public Notice and
Opportunity for Comment
(33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)**

138.     The Conservation Organizations incorporate by reference all of the preceding paragraphs.

139.     Section 404(c) requires the Administrator to provide "notice and an opportunity for

public hearing" in order to determine whether a proposed project will cause unacceptable

adverse effects.  33 U.S.C. § 1344(c).

140.     EPA's regulations establish a robust public process "whenever the Administrator is

considering whether the specification of any defined area as a disposal site should be prohibited,

denied, restricted, or withdrawn."  40 C.F.R. § 231.1(c).

141.     EPA has never revoked a veto.

142.     EPA has modified only three vetoes, and each modification occurred only after EPA

complied with the key elements of the Section 404(c) process, including a public hearing and

opportunity for written comments, preparation and submittal of a recommended determination,

and issuance of a final determination demonstrating that the modification will not cause

unacceptable adverse effects.

143.     The Veto bears the hallmarks of formal notice-and-comment rulemaking.  EPA provided

notice and an opportunity for public comment before finalizing the Veto.  Furthermore, the Veto

binds future EPA Administrators by requiring them to prohibit the specification of the subject

wetlands as a present or future disposal site, absent a withdrawal or modification of the Veto.

144.     EPA did not, however, provide any public notice or opportunity for comment, or a public

hearing, prior to the Veto Revocation.  Instead, EPA's Region IV Administrator revoked the veto

in a cover letter submitted to the Corps with technical comments regarding the Corps' 2020

DSEIS.

145.     EPA's failure to provide public notice and opportunity for comment violates Section

404(c) of the Clean Water Act, the agency's own prior practice and long-standing position, and

the APA's rulemaking requirements.

### FIFTH CLAIM FOR RELIEF

**The Region IV Administrator Does Not Have Legal
Authority to Revoke the Veto.
(33 U.S.C. § 1251 et seq. and 5 U.S.C. § 706)**

146.     The Conservation Organizations incorporate by reference all of the preceding paragraphs.

147.     The Clean Water Act grants authority to prohibit the specification of disposal sites for

dredge and fill materials to the Administrator of the EPA.  33 U.S.C. § 1344(c)

148.     In 1984, the EPA Administrator delegated the authority to make final decisions under

Section 404(c) to EPA's national Clean Water Act Section 404 program manager, who is the

Assistant Administrator for the Office of Water.  In a subsequent Delegation of Authority

Memorandum dated March 30, 2018, EPA Administrator Pruitt delegated 404(c) authority "to

36

restrict or prohibit designation of disposal sites" to the Assistant Administrator for the Office of Water.

149.    The EPA Region IV Administrator signed the final decision that unlawfully revokes the Veto and allows the Corps to proceed with the very same pumps project prohibited by the Veto.

150.    Yet, the EPA Region IV Administrator lacks the authority under the Clean Water Act to revoke the Veto to allow the Yazoo Pumps Redo.  That authority is delegated to the Assistant Administrator for the Office of Water.

151.    Accordingly, the Veto Revocation is contrary to law and in excess of statutory jurisdiction, authority, or limitations, in violation of the APA.  5 U.S.C. § 706.

**REQUEST FOR RELIEF**

The Conservation Organizations request that the Court grant the following relief:

A. Declare that EPA's decision to revoke the Veto and allow the Corps to proceed with the Yazoo Pumps Redo is arbitrary, capricious, and not in accordance with the Clean Water Act;

B. Vacate and set aside the Veto Revocation;

C. Enter appropriate injunctive relief;

D. Award the Conservation Organizations all reasonable costs and attorneys' fees as authorized by law; and

E. Award the Conservation Organizations such other relief as this Court deems just and appropriate.

Dated: January 12, 2021                    Respectfully submitted,

*/s/ Anna Sewell*
Anna Sewell (D.C. Bar No. 241861)
Earthjustice
1001 G St. NW Suite 1000
Washington, DC  20001
Tel.: (202) 667-4500 ext. 5233
asewell@earthjustice.org

37

*Local Counsel for Plaintiffs American Rivers,*
*National Audubon Society, Sierra Club, and*
*Healthy Gulf*

/s/ Stuart C. Gillespie
Stuart C. Gillespie (CO Bar No. 42861)
(*pro hac vice pending*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
Tel.: (303) 996-9616
sgillespie@earthjustice.org

/s/ Jill Heaps
Jill Heaps (NY Bar No. 4145405)
(*pro hac vice pending*)

/s/ Sharmeen Morrison
Sharmeen Morrison (NY Bar No. 5759907)
(*pro hac vice pending*)

Earthjustice
48 Wall Street, 15th Floor
New York, NY  10005
Tel.: (212) 845-7376
jheaps@earthjustice.org
smorrison@earthjustice.org

*Counsel for Plaintiffs American Rivers, National*
*Audubon Society, Sierra Club, and Healthy Gulf*